60 F.3d 837
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 James NANCE, Petitioner - Appellant,
v.
Michael A. NELSON, Robert T. Stephan, Respondents - Appellees.
 No. 94-3389.
 United States Court of Appeals, Tenth Circuit.
 June 21, 1995.
 
 Before ANDERSON, BALDOCK, and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT*
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 James Nance was convicted by an Oklahoma jury of felony murder in connection with the death of Nathaniel Burnett, aggravated robbery arising from the robbery of Mr. Burnett's house after he was murdered, and unlawful possession of a firearm. Mr. Nance received concurrent sentences of fifteen years to life, life, and two to ten years. The conviction was affirmed in petitioner's direct appeal to the Kansas Supreme Court. State v. Nance, No. 64,668 (Kan. Mar. 1, 1991) (unpub. op.). The Kansas Supreme Court also affirmed the trial court's decision to deny petitioner's motion for a new trial.
 
 
 3
 Nance's subsequent motion for post-conviction relief, Kan. Stat. Ann. Sec. 60-1507, was denied by the state sentencing court, and that decision was affirmed on appeal to the Kansas Court of Appeals. Nance v. State, No. 68,098 (Kan. App. Apr. 30, 1993) (unpub. op.). After exhausting his state remedies, Mr. Nance then filed this, his first federal habeas petition, claiming eight grounds for relief. The district court found no merit to any of the claims, denied relief, and this appeal followed.
 
 
 4
 The Kansas Supreme Court and the federal district court in this case have done admirable jobs of setting out the law and the facts with respect to Mr. Nance's claims. In order to avoid redundancy and maintain consistency, we attach the opinions of those courts to this disposition. In doing so, we respect the fact that we owe deference to the factual findings of the state courts, including the appellate courts, and are bound by those findings if they are supported by the record. See Case v. Mondragon, 887 F.2d 1388, 1392 (10th Cir. 1989), cert. denied, 494 U.S. 1035 (1990); 28 U.S.C. Sec. 2254(d). There is no question but what the factual findings by the Kansas Supreme Court are fully supported by the record.
 
 I.
 
 5
 Because many of Mr. Nance's claims are governed by the same analysis, we elect to outline each of his claims in detail in this section. As set forth in Mr. Nance's federal habeas petition filed in July 1993, Nance raises the following eight grounds for relief.
 
 
 6
 Claim 1.
 
 
 7
 Mr. Nance first contends that "the trial court abused its discretion in admitting exhibit #16 where the jury could infer that Mr. Nance had other prior convictions, which were inadmissible." He also challenges exhibit 16 on the ground that even though it was a certified copy of his prior conviction in Lyon County, Kansas, it was not authenticated.
 
 
 8
 The state offered exhibit 16 to establish Nance's prior conviction on a weapons violation as a necessary element of its unlawful possession of a firearm charge. The exhibit showed two other unrelated counts, which the state redacted by the use of typewriter and black marker. It is the redacted sections to which Mr. Nance primarily objects.
 
 
 9
 He argues that the jury could infer from the fact that other (although unreadable) counts were listed on the same sheet as the firearms count, that he is a confirmed wrongdoer, that his evidence should not be believed, and that some connection existed between the redacted counts and the charge for which he was presently being tried.
 
 
 10
 Claim 2.
 
 
 11
 The state's principal witness against Mr. Nance was Anita Nance, his wife. Among other things, she testified about Mr. Nance's intention to rob someone, the trip to the Burnett house, hearing a shot, observing Mr. Nance in the back seat of the car wiping a weapon while they were driving away from the scene, and seeing him throw the weapon out of the window. Later, when Mr. Nance and his wife were alone, Mrs. Nance testified that her husband confessed that he was the trigger man in the Burnett murder. The Kansas Supreme Court found that this latter testimony was a violation of the marital privilege established by Kansas statute, but under appropriate standards it did not require reversal. It held that Anita Nance's testimony about what she saw and heard while driving to and from the Burnett house was not privileged because a third person was present.
 
 
 12
 Mr. Nance's attorney failed to object to Anita Nance's testimony in violation of the statutory marital privilege. Because of that, Mr. Nance claims ineffective assistance of counsel. The testimony in violation of the state marital privilege and his associated ineffective assistance of counsel claim are major elements of Mr. Nance's federal habeas petition.
 
 
 13
 Claim 3.
 
 
 14
 Mr. Nance next claims that he should have been granted a new trial based on newly discovered evidence. His argument is as follows:
 
 
 15
 The evidence linking defendant Nance with the murder came from to [sic] sources: the eyewitness identification from two children who saw the criminals, and Anita Nance testimony that James Nance and Gregory Mil committed the robbery and murder. The identification was extremely weak. Teako said the man he thought was Nance had a scar, yet the photo he picked, which identified Nance had no scar. The kids where [sic] of grade school age, the longest glimpse they had of the suspects was 5-10 seconds, the incident occurred at night around 9:30 p.m. and the suspect identified as Nance had a scarf around his face. At Nance preliminary hearing she stated that she voluntarily went to Atchison on the night of the murder because it was her home. At the preliminary hearing of Gregory Milo's Anita stated that she was threatened and forced to go to Atchison to participate in the events which occured [sic]. The record shows that Anita's testimony changed so radically that it could have affected the trial outcome.
 
 
 16
 Petition for a Writ of Habeas Corpus, Nance v. Nelson, No. 93-3295, D. Kan., filed July 27, 1993, at 10.
 
 
 17
 Claim 4.
 
 
 18
 Mr. Nance next argues that his wife, Anita, perjured herself, thus depriving him of a fair trial. The alleged perjury consists of differences between Mrs. Nance's testimony at the preliminary hearing and at the trial. At the preliminary hearing she said she had seen no guns, whereas she was certain at trial that he threw a gun out the car window. She also testified at the preliminary hearing that they did not stop the car to throw out the gun. At trial, however, she testified that they stopped the car to throw out the gun. Finally, at preliminary, Mrs. Nance said that there was no conversation regarding who fired the shot, but at trial she testified that Mr. Nance confessed the murder to her privately on the night of the 17th.
 
 
 19
 Mr. Nance also claims that when his wife met with Special Agent Duane Robert, she lied about some things and left out some things. These alleged lies and omissions also centered on her testimony with respect to the gun that Mr. Nance supposedly possessed in the vehicle before and after the murder.
 
 
 20
 Claim 5.
 
 
 21
 Mr. Nance also challenges the lineup identification by Mattie Burnett, and Teako and Kea Jackson, her children. As to Mrs. Burnett, Mr. Nance points out that although she was unable to pick his picture out of a photo array, while she was at the courthouse she heard Mr. Nance yelling at a judge and immediately claimed that she recognized the voice as that of the man who had ordered her around in the Burnett household on the night of the murder.
 
 
 22
 Mr. Nance attacks Teako Jackson's identification on the ground that the boy stated to the police that the assailant wore a bandana over his nose and mouth and had a scar just under his cheekbone. At trial, however, he testified that he was shown six photographs by the police, and he identified James Nance as the tall man with the bandana, but that the police had shown him one of the six photos before and he had never seen four of the others. And, Mr. Nance does not have a scar as Teako Jackson originally reported to the police.
 
 
 23
 As to Kea Jackson, Mr. Nance questions the reliability of her identification testimony. First, he says she was too young to be reliable (she was nine years old at the time). Second, he argues that her identification lacked trustworthiness because she claimed to have identified him by seeing only his eyes and hair, and she had only two to five seconds to observe the assailant the first time that he came into her room following Mr. Burnett's murder, and less than five to ten seconds the second time he came into the room.
 
 
 24
 Claim 6.
 
 
 25
 Mr. Nance also asserts that his due process rights were violated by the court's failure to give two instructions to the jury. He argues that the court should have instructed the jury on "accomplice testimony," because absent Mrs. Nance's testimony there was no eyewitness who could state that Mr. Nance himself shot Mr. Burnett. He also argues that the jury should have been instructed on what constitutes "possession" of an unlawful firearm. With respect to this latter argument, Nance argues that the jury instruction given did not conform to the Kansas Pattern Instruction, which defines possession as having custody of a firearm with the intent to control its management and use.
 
 
 26
 Mr. Nance contends that his fingerprints were not on the murder weapon and no eyewitness could testify that the firearm was in his possession and control (except for Anita Nance's testimony that she saw a pistol in her husband's possession in the automobile following the murder and robbery, saw him wipe it off, and saw him throw it out the window of the car). Mr. Nance also points out that state officials were not able to determine that the bullet from Mr. Burnett's body was fired from the gun found in the roadway the day after the murder. The state examiner testified that there were quite a number of .38 Smith & Wesson revolvers in existence.
 
 
 27
 Claim 7.
 
 
 28
 Finally, Nance asserts that his counsel was ineffective in four ways. First, he claims that his lawyer should have filed a motion to suppress identification testimony based on the lineup, and inconsistencies in the eyewitness's identification. Second, he claims that his counsel should have determined that Anita Nance was committing perjury and somehow prevented her from testifying. Third, he claims that his counsel should have objected to evidence with respect to the firearm when there was no factual basis to tie the firearm to Mr. Nance. Last, he alleges that his counsel was ineffective in not objecting to Anita Nance's testimony that Mr. Nance confessed to murdering Mr. Burnett, when that testimony violated the Kansas law on marital privilege, Kan. Stat. Ann. Secs. 60-423(b), 60-428.
 
 
 29
 Mr. Nance sought the appointment of counsel and a full evidentiary hearing in the district court, both of which motions were denied. He contends that the district court erred in these rulings as well.
 
 
 30
 Additional Claims.
 
 
 31
 We have elected not to reproduce every argument made by Mr. Nance in his petition, only the major ones. However, we have considered every additional point and conclude that they are disposed of by analysis of the major claims.
 
 
 32
 As indicated above, the Kansas Supreme Court and the federal district court have both ably and exhaustively explored the facts and law with respect to each of these claims. We incorporate and substantially adopt their analyses, subject to the following additional comments.
 
 
 33
 We have carefully read through all of Mr. Nance's submissions, both below and in this court. The main characteristic of those submissions is an attempt by Mr. Nance to retry his case. He challenges the admission of evidence, the application of state statutes, the state's interpretation of its own law and procedures, the credibility of witnesses, and similar matters all relating to the conduct of his trial. Although not explicitly articulated and pursued as such, a great deal of this argument constitutes an attack on the sufficiency of the evidence to convict.
 
 
 34
 In all of his arguments Mr. Nance evidences a fundamental misconception of the role of federal courts in habeas corpus proceedings. Habeas corpus "is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials," but only "to guard against extreme malfunctions in the state criminal justice systems." Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring). More recently, the Supreme Court has emphasized the limits of federal habeas review as follows:
 
 
 35
 We have stated many times that "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Pulley v. Harris, 465 U.S. 37, 41 (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. Sec. 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975) (per curiam).
 
 
 36
 Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (parallel citations omitted).
 
 
 37
 Within these strictures, we accumulate under the sufficiency of the evidence heading all of Mr. Nance's arguments regarding credibility and other attacks on the witnesses, and apply the constitutional standard set forth in Jackson v. Virginia. In reviewing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Tapia v. Tansy, 926 F.2d 1554, 1562 (10th Cir.), cert. denied, 502 U.S. 835 (1991). Contrary to Mr. Nance's claims, the facts of this case overwhelmingly support the proposition that a rational trier of fact could have found the elements of the crime charged, beyond a reasonable doubt. Therefore, we reject all of Mr. Nance's arguments which fairly fall under the aegis of how he views and how he would argue the evidence at trial.
 
 
 38
 After reviewing the evidence with respect to Mr. Nance's attacks on identification testimony and an improper photo array in the form of a pretrial lineup, we conclude that neither the identifications nor the lineups were constitutionally unreliable. See Neil v. Biggers, 409 U.S. 188, 201 (1972). Accordingly, with respect to this matter, and with respect to Mr. Nance's arguments regarding his counsel's failure to file a motion to suppress, we find there can be no ineffective assistance of counsel because there was no error. With respect to the claimed error in failing to give the Kansas Pattern Jury Instruction on possession, the Supreme Court addressed an identical argument in Estelle v. McGuire, 502 U.S. at 71-72, and concluded that although an instruction may be incorrect under state law, that is not a basis for habeas relief. Id. at 71-72; see also Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983); cf. Gilmore v. Taylor, 113 S. Ct. 2112, 2118-19 (1993). Furthermore, as to the "accomplice" instruction, the Kansas Supreme Court made it clear that under Kansas law the state is not required to prove that the defendant did the actual shooting in order to convict him of felony murder. State v. Nance, No. 64,668 at 18. The state put on constitutionally adequate evidence to support its charge, and Mr. Nance was not prevented from presenting exculpatory evidence or other evidence in defense to the jury. There is no federal constitutional right to have a specific jury instruction under state law in these circumstances. Cf. Taylor, 113 S. Ct. at 2118-19.
 
 
 39
 Mr. Nance's constitutionally ineffective assistance of counsel claim is governed by the two-part test set out in Strickland v. Washington, 466 U.S. 668, 687 (1984). The defendant has the burden of proving that his counsel's performance was not just deficient, but that he made errors so serious that he was not functioning as "counsel" guaranteed by the Sixth Amendment. And, the defendant must show that counsel's deficient performance prejudiced the defense. Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; Brewer v. Reynolds, 51 F.3d 1519, 1523 (10th Cir. 1995) (citing cases). The Supreme Court has recently made it clear that this is a very high standard, one which is "greater than the harm sufficient for reversal under Kotteakos." Kyles v. Whitley, 115 S. Ct. 1555, 1567 (1995). "Under Kotteakos a conviction may be set aside only if the error 'had substantial and injurious effect or influence in determining the jury's verdict."' Id.
 
 
 40
 We have examined all of the errors in this case assigned by Mr. Nance to his ineffective assistance of counsel claim, and have done so both individually and, as required under Kyles, cumulatively. We have done so in the context of the entire record, and we conclude that our confidence in the outcome of this state court trial has not been undermined.
 
 
 41
 Accordingly, we reject Mr. Nance's ineffective assistance of counsel claims.
 
 II.
 
 42
 With respect to the denial of Mr. Nance's motions to be provided counsel and for an evidentiary hearing, the appointment of counsel in a habeas action lies within the sound discretion of the habeas court unless the case is so complex that the denial of counsel would amount to the denial of due process. Brown v. United States, 623 F.2d 54, 61 (9th Cir. 1980). This is not such a case. And, Townsend v. Sain, 372 U.S. 293, 318 (1963), does not require an evidentiary hearing in federal court where the evidence is fairly developed in the state court record or is unnecessary due to the nature of the arguments presented. For instance, Mr. Nance's claim that his attorney should appear in court to testify that his performance was deficient, our holding that the prejudice prong of Strickland has not been satisfied renders moot the question of the adequacy of Nance's counsel.
 
 III.
 
 43
 We have carefully reviewed the record in this case and all of Mr. Nance's arguments and, for the reasons stated above, including those set forth in the attached district court and Kansas Supreme Court opinions, we conclude that the district court was correct in denying Mr. Nance's petition for a writ of habeas corpus. Accordingly, Mr. Nance's application for a certificate of probable cause is GRANTED; his motion to proceed without prepayment of costs and fees is GRANTED; and the judgment of the district court is AFFIRMED.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF KANSAS
 
 44
 James Nance, Petitioner,
 
 
 45
 v.
 
 
 46
 Michael A. Nelson, et al., Respondents.
 
 Case No. 93-3295-DES
 MEMORANDUM AND ORDER
 
 47
 SAFFELS, District Judge.
 
 
 48
 Petitioner proceeds pro se on a petition for writ of habeas corpus, 28 U.S.C. Sec. 2254. This matter is now ready to be decided. Respondents filed an Answer and Return, and petitioner filed his traverse thereto. Respondents also filed an Amended Answer and Return to set forth a more complete factual background to their pleading. Having examined the record, the court enters the following findings and order.
 
 
 49
 Petitioner was convicted in October 1989 by a state court jury of first degree murder, aggravated robbery, and unlawful possession of a firearm by a felon. He was sentenced to serve terms of imprisonment for life, 15 years to life, and 2 to 10 years, respectively. The conviction was affirmed in petitioner's direct appeal to the Kansas Supreme Court.[1] Petitioner's later motion for post-conviction relief, K.S.A. 60-1507, was denied by the state sentencing court, and that decision was affirmed on appeal to the Kansas Court of Appeals.[2]
 
 
 50
 The relevant factual background to petitioner's claims is straightforward. On June 17, 1989, two men robbed the Burnett home in Atchison, Kansas, and killed Nathaniel Burnett. Present in the home at the time were three children and Mrs. Burnett, all of whom identified Nance as one of the two men. The other man was identified as Greg Milo. During Nance's trial, his wife (Anita Nance) testified as to what she observed that night both outside the Burnett home and during the drive with Nance and Milo back to Kansas City. She also testified as to what Nance told her about the killing and the robbery.
 
 
 51
 In his petition for habeas corpus relief, petitioner sets forth the following allegations of error: (1) impermissible evidence of petitioner's prior convictions was admitted by the State, (2) the state trial court erred in not granting a mistrial or new trial based upon petitioner's defense counsel's failure to object to evidence protected by petitioner's marital privilege, (3) petitioner was entitled to a new trial because Anita's testimony in a later case[3] constituted new evidence regarding her lack of credibility, (4) Anita committed perjury, (5) the state trial court erred in not granting a new trial based upon petitioner's defense counsel's failure to object to identification evidence, (6) the jury was not instructed regarding accomplice testimony, (7) the jury was not properly instructed regarding possession of an unlawful firearm, and (8) petitioner did not receive effective assistance of counsel. The court finds no merit to any of these claims.
 
 
 52
 Rulings by a state court on the admissibility of evidence will not be questioned in federal habeas proceedings unless they render trial so fundamentally unfair as to constitute denial of due process. Tucker v. Makowski, 883 F.2d 877, 881 (10th Cir. 1989). Here, petitioner challenges the admission of a journal entry of his conviction in 1984 by plea agreement to three criminal offenses. As proposed and accepted by petitioner's defense counsel, two offenses were masked by typeover X's and black ink. This alteration left visible the third offense, which petitioner does not dispute was admissible as evidence to prove a necessary element of the state crime of unlawful possession of a firearm, K.S.A. 21-4204. The Kansas Supreme Court found no prejudicial error. This court agrees, and finds no violation of petitioner's right to due process.
 
 
 53
 Petitioner's next issue deals with evidentiary rulings by the state trial court regarding Anita's testimony which petitioner claims was protected by marital privilege. Again, petitioner fails to demonstrate the alleged error rendered his trial fundamentally unfair. The Kansas Supreme Court found no reversible error, even though the challenged testimony was subject to the marital privilege and was inadmissible.[4] This court finds the error did not have "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 113 S.Ct. 1710, 1714 (1993) (quoting Kotteakos v. U. S., 328 U.S. 750, 756 (1946)). Nor does the violation present an issue under the United States Constitution. Alleged violations of state law are not cognizable in a federal habeas corpus proceeding. Pulley v. Harris, 465 U.S. 37, 41-42 (1984). Here, "[t]he marital privilege is merely a testimonial privilege based on statutory provision or found in the common law...[and] does not rise to the level of the constitutionally guaranteed right against self-incrimination under the Fifth Amendment." Rankin v. Roberts, 788 F.Supp. 521, 523 (D.Kan. 1992)(citations omitted), aff'd, 9 F.3d 117 (10th Cir. 1993).
 
 
 54
 Petitioner's third and fourth claims address the credibility of Anita's testimony. Petitioner seeks relief based upon discrepancies in Anita's testimony at various hearings in petitioner's criminal proceeding, and at her testimony in a related criminal matter after petitioner's trial. This court, however, is not to weigh conflicting evidence or consider the credibility of witnesses. U.S. v. Davis, 965 F.2d 804, 811 (10th Cir. 1992), cert. denied, 113 S.Ct. 1255 (1993). The Kansas Supreme Court found no reversible error by the state trial court in denying petitioner a new trial based upon Anita's later testimony. Factual findings by state trial and appellate courts are entitled to a presumption of correctness unless a federal court concludes that a factual determination is not fairly supported by the record. Lafferty v. Cook, 949 F.2d 1546, 1549 (1991), cert. denied, Cook v. Lafferty, 112 S.Ct. 1942 (1992); 28 U.S.C. Sec. 2254(d)(8). Here, the record fully supports the state court finding.
 
 
 55
 Petitioner alleges perjury by Anita, but does not claim the State knowingly used perjured testimony to obtain petitioner's conviction. Even if petitioner were able to show perjury, it is clearly established that "the mere use of perjured testimony without the prosecution's knowing it was perjured is not a denial of due process." Gay v. Graham, 269 F.2d 482, 486 (10th Cir. 1959). "[T]he burden is on the petitioner to prove that material evidence was perjured and that it was knowingly used by the prosecution to obtain a conviction." Oyler v. Taylor, 338 F.2d 260, 263 (10th Cir. 1964), cert. denied, 382 U.S. 847 (1965).
 
 
 56
 Petitioner next claims his identification by Mrs. Burnett and the children denied him due process. Petitioner points to inconsistencies between petitioner and the descriptions given to the police, and to Mrs. Burnett's recognition of petitioner's voice when petitioner first appeared in the courtroom. Petitioner did not object to this identification evidence during his trial. He first raised the issue in his motion for a new trial, which the state trial court considered and denied. The court finds nothing in the record to warrant setting aside the presumption of correctness afforded this state court finding. Sumner v. Mata, 455 U.S. 591, 597 (1982).
 
 
 57
 Petitioner's allegations of constitutional error in the manner in which the state court instructed the jury are without merit. Federal habeas corpus proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the error had the effect of rendering the trial so fundamentally unfair as to cause petitioner the denial of a constitutionally fair trial. Hunter v. State of N.M, 916 F.2d 595, (1990), cert. denied, Hunter v. Tansey, 500 U.S. 909 (1991). The court finds no such error has been demonstrated in the present case.
 
 
 58
 Finally, petitioner claims he was denied effective assistance of counsel in that his trial counsel failed to suppress the identification evidence, and failed to object to Anita's testimony on grounds of perjury and marital privilege. To establish his claim of ineffective assistance of counsel, petitioner must meet the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). The two-part Strickland test requires: (1) a showing that counsel committed errors so serious that the defendant did not receive the counsel guaranteed by the Sixth Amendment, and (2) a showing that counsel's performance was so deficient that the defendant did not receive a fair trial. Under Strickland, the defendant bears the burden to establish both incompetence and prejudice, and there is a presumption that the attorney's conduct comes within "the wide range of reasonable professional assistance." Id. at 689. The court finds petitioner is unable to satisfy this constitutional standard.
 
 
 59
 For the reasons cited herein, the court concludes petitioner is not entitled to habeas corpus relief.
 
 
 60
 IT IS HEREBY ORDERED that the petition for writ of habeas corpus is denied.
 
 
 61
 DATED: This 27th day of October, 1994 at Topeka, Kansas.
 
 NOT DESIGNATED FOR PUBLICATION
 IN THE SUPREME COURT OF THE STATE OF KANSAS
 No. 64,668
 
 62
 State of Kansas, Appellee,
 
 
 63
 v.
 
 
 64
 James Nance, Appellant.
 
 MEMORANDUM OPINION
 
 65
 Appeal from Atchison district court; MAURICE P. O'KEEFE, JR., judge. Opinion filed March 1, 1991. Affirmed.
 
 
 66
 Reid T. Nelson, assistant appellate defender, argued the cause, and Jessica R. Kunen, chief appellate defender, was with him on the brief for appellant.
 
 
 67
 Gunnar A. Sundby, county attorney, argued the cause, and Robert T. Stephan, attorney general, was with him on the brief for appellee.
 
 Per Curiam:
 
 68
 James Nance appeals his convictions of aggravated robbery (K.S.A. 21-3427), felony murder (K.S.A. 21-3401), and unlawful possession of a firearm (K.S.A. 21-4204). He received concurrent sentences of 15 years to life, life, and 2 to 10 years.
 
 
 69
 On June 17, 1989, Nathaniel Burnett was killed in his home by a gunshot wound to his head just behind his right ear. Burnett's wife, Mattie, was home in the back bedroom with two of her three children and a niece at the time Burnett was shot.
 
 
 70
 Mattie testified that, on June 17, she heard a knock on the door, heard Nate ask who it was, heard a rumble, and then heard a shot. A man then came into the room and demanded their valuables and insisted that Mattie get the keys, which were in Burnett's pocket, to the safe located in another bedroom. She obtained the keys from Burnett's pocket, opened the safe, and put the money and other contents of the safe in a pillowcase that the man had taken off a pillow on the bed. The man also insisted that she give him rings and other jewelry, including the ring she was wearing. She testified that the man held a gun on her the whole time.
 
 
 71
 Mattie was not able to identify the man who had come into the house from a photo array or a videotape, although she had glimpsed his face during the robbery. She subsequently was able to recognize his voice as that of the man who had ordered her about the house the night Burnett was killed.
 
 
 72
 Mattie's two children Teako and Kea, who were present the night Burnett was killed, testified to events that paralleled and corroborated Mattie's testimony. Teako identified the defendant's photograph as the individual who was present in the house that night. Teako testified that the night Burnett was killed, the man that he identified as defendant came into the bedroom for a few seconds and then returned a second time for about ten seconds. Kea's testimony was essentially the same as Teako's. She also identified the defendant as the man who had come into the room the night of the shooting.
 
 
 73
 The State's chief witness was Anita Nance. Anita's sister was Alganette Trevillion. Alganette's son is Bobby Smith. On June 16, which was the day before Burnett was killed, Anita Nance, defendant, Alganette, and Alganette's friend drove from the Kansas City area, where they all lived, to Atchison to get Bobby Smith's son. While in Atchison, Alganette told Bobby Smith not to get in the car with Anita and defendant because they were planning to rob someone.
 
 
 74
 On the way back to Kansas City on June 16, the group stopped at Burnett's residence. Mattie gave Alganette a tour of the house that Burnett had remodeled for her and her children. Once Alganette returned to the car, she discussed what she had seen with defendant and Anita, including a safe in one of the bedrooms.
 
 
 75
 Anita testified that, on the night of June 17, she returned to Atchison with defendant and Gregory Milo in defendant's mother's car, a maroon Chevy. At about 7:30 p.m., they stopped by Burnett's residence, and Gregory Milo walked to the house to ask about purchasing drugs. Next, they drove to Bobby Smith's house in Atchison. Then they stopped at Coyetta Seymore Green's house and asked Coyetta to knock on Burnett's door to be sure that he was not home so that they could "rob" him. Coyetta refused to help.
 
 
 76
 After Coyetta refused, the trio drove to Burnett's house. Anita testified that she stayed in the car while defendant and Gregory Milo went into the house. She heard a gunshot. They returned to the car with a .22 rifle and a pillowcase. Anita drove the car. She noticed that defendant wiped a gun and threw it out the window. When she asked what had happened, no one said anything. They went to the home of defendant's sister, Dora Kingyon, and spread everything out on the bed. They had stolen $6,000 in cash, which was divided equally between defendant and Gregory Milo. They also had several women's rings and men's watches. Anita testified that they offered her rings but she did not want them.
 
 
 77
 On June 18, an Atchison resident found a gun in the middle of Old Highway 73 just south of the Burnett residence. Another person found two cartridge cases--one empty and one loaded. Later, a KBI firearms examiner established that the bullet found in Burnett's brain had the same class of characteristics as those fired from the weapon, a Smith & Wesson .38 revolver, found on Old Highway 73, but he could not definitely say that the bullet had been fired from that gun. The examiner also testified that the empty cartridge case was definitely a shell casing fired from the .38 revolver that was found lying in the middle of Old Highway 73.
 
 
 78
 As rebuttal to defendant's alibi defense, the State presented testimony from a KBI agent who interviewed defendant during his confinement in Emporia on other charges. He testified that, during the interview, defendant admitted that he had been in Atchison on June 16 at Bobby Smith's house between 6:00 and 7:00 p.m. and on June 17 at Smith's house between 7:00 and 8:00 p.m., and that he was back in Kansas City by 9:00 p.m. that night.
 
 
 79
 The first issue is whether the district court erred in admitting a journal entry that established defendant's 1984 conviction of unlawful possession of a firearm. Defendant alleges that the district court abused its discretion in admitting the journal entry because it allowed the jury to infer that defendant had prior convictions that were not admissible. Defendant argues that this violated K.S.A. 60-455.
 
 
 80
 The journal entry, designated as Exhibit 16, established that defendant, on December 10, 1984, pled guilty to Count 2, unlawful possession of a firearm, a class D felony. Just before the trial began in this case, the State sought to clarify the exhibits it wanted to introduce. Exhibit 16 was offered. Defendant objected because the exhibit was certified and not authenticated and because references to Count 1 and Count 3 in this journal entry had been struck with an "X," allowing the jury to see that defendant had pled guilty to other offenses. Defendant argued that the jury could wonder if the stricken portion of the journal entry referred to a previous conviction for murdering someone else.
 
 
 81
 The court asked if defendant would stipulate to the prior conviction for unlawful possession of a firearm, but defendant declined. Instead, defendant insisted an aunthenticated copy of something that indicated just the admissible conviction. Apparently, Count 1 of the journal entry in Exhibit 16 was a felony charge of aggravated robbery; this court reversed the conviction on that count because the complaint did not correctly allege all the elements of the offense charged. Count 3 charged misdemeanor possession of marijuana. In response, the State noted that, in addition to striking through the references to Count 1 and Count 3, it could also cross them out with a black Magic Marker. The court reserved making a final ruling on the admission of this exhibit prior to trial.
 
 
 82
 When the State sought to admit Exhibit 16 at trial, it noted that it had used a typewriter to strike out references to Counts 1 and 3 and then marked through them with a black Magic Marker. Defendant again objected because the jury could attempt to read through the markings and might infer that defendant had been convicted of murder on a previous occasion. The court admitted Exhibit 16.
 
 
 83
 The defendant was charged with unlawful possession of a firearm, in violation of K.S.A. 21-4204, which prohibits the possession of a firearm with a barrel less than 12 inches long by a person within five years of a felony conviction or within five years of release from imprisonment for a felony conviction. The felony conviction of unlawful possession of a firearm contained in the journal entry in Exhibit 16 resulted from a guilty plea on December 10, 1984, and therefore is within the 5-year limit for conviction of a prior felony for purposes of K.S.A. 21-4204.
 
 
 84
 The State points out that this court has held on numerous occasions that evidence of a prior felony is a necessary element of the crime of unlawful possession of a firearm pursuant to K.S.A. 21-4204. State v. Loudermilk, 221 Kan. 157, 159-60, 557 P.2d 1229 (1976). Even if a defendant admits prior felony convictions, the State can still present separate and independent proof of a prior conviction. State v. Johnson, 216 Kan. 445, 448, 532 P.2d 1325 (1975). Therefore, evidence of the prior conviction was admissible to prove the element needed for violation of K.S.A. 21-4204, even though such evidence may not have been admissible under the guidelines established in K.S.A. 60-447 and K.S.A. 60-421. See State v. Farris, 218 Kan. 136, 139, 542 P.2d 725 (1975).
 
 
 85
 Once it is established that evidence of the prior crime can be admitted, the question becomes how that prior crime can be proven. The State here used a journal entry. This court has held that proof of a prior conviction can be established by a journal entry, but the parties should use care to excise those portions that refer to unrelated or inadmissible prior convictions.
 
 
 86
 This court disapproved the procedure used in State v. Farris, 218 Kan. at 138-39, in which the entire file of a case was introduced to establish a previous conviction of unlawful possession of a firearm. We reviewed the independent testimony that occurred in the case, including defendant's own testimony that he had pled guilty to the prior felonies and was on probation for a burglary conviction at the time of the incident giving rise to the conviction he was appealing. Based upon this testimony, this court noted that, although defendant was entitled to a fair trial, he was not assured a perfect one. Thus, we concluded that the erroneous admission of the evidence did not require the reversal of the conviction. 218 Kan. at 139-40.
 
 
 87
 Here, the State chose to prove the element of a prior conviction by offering a certified copy of a prior conviction from Lyon County, Kansas. The State sought to eliminate any possibility of prejudice arising from evidence of the unrelated misdemeanor conviction and the reversed felony conviction by striking those from the journal entry and crossing through them with a black marker. The State's efforts to excise improper portions of the journal entry were appropriate. The journal entry does state in one paragraph that defendant "will enter a plea of guilty to Count 1, Count 2 as amended, and Count 3," without any attempt to excise the reference to Counts 1 and 3. Otherwise, however, the only reference that remains in the document is to Count 2.
 
 
 88
 In his brief, defendant argues that only an extremely naive juror would fail to assume that three prior convictions were established by the journal entry where one prior conviction was juxtaposed between two marked-out portions. Defendant argues that this is directly contrary to the dictates of K.S.A. 60-455 because the jury was allowed to freely speculate about the nature of the marked-out portions of the crime and, therefore, the case should be reversed. We do not agree.
 
 
 89
 The defendant refused to stipulate to the one conviction and offered no alternative to the introduction of this excised journal entry. We recognize that the State has the burden of proving its case against the defendant, and it is not incumbent upon the defendant to aid the State in that endeavor. However, defendant's refusal to stipulate is a factor to be considered in determining if reversible error was committed by the district court.
 
 
 90
 An additional factor is that the defendant presented no evidence that the jury did in fact speculate as to the two excised counts. If the jury did speculate, it was possible to read through the markings by holding Exhibit 16 so that the light strikes it in a certain way, but nothing indicates that the jury did this. The conduct in the jury room is presumed to be appropriate unless evidence is produced indicating otherwise. See Cornejo v. Probst, 6 Kan. App. 2d 529, 532-33, 630 P.2d 1202, rev. denied 230 Kan. 817 (1981). It would have been a better practice after the exhibit was admitted into evidence to have submitted a copy of the exhibit with the two counts deleted to the jury. In that way, the original exhibit remains intact as part of the record, and the jury is given the copy showing only the one conviction necessary to support the charge. However, we find no showing of prejudice to the defendant by the procedure utilized by the district court in this case.
 
 
 91
 We find, therefore, that the district court did not commit reversible error in allowing the introduction of the journal entry which excised references to two other counts by striking through them with a typewritten "X" and by marking through the stricken portions with a black Magic Marker.
 
 
 92
 Defendant contends in his two remaining issues that the district court abused its discretion in not granting a motion for new trial. Pursuant to K.S.A. 22-3501, the court, on motion of a defendant, may grant a new trial "if required in the interest of justice." The decision of whether to grant a motion for new trial lies within the sound discretion of the trial court. State v. Parker, 213 Kan. 229, 233, 516 P.2d 153 (1973). A motion for new trial should not be granted unless the trial court is satisfied that retrying the case for whatever reason advanced by the defendant would probably result in a different verdict. State v. Davidson, 2 Kan. App. 2d 463, 465, 581 P.2d 1190 (1978).
 
 
 93
 Defendant first argues that the district court should have granted a new trial because defense counsel did not object to the most inculpatory evidence introduced at trial and, thus, the representation provided constituted ineffective assistance of counsel. The testimony in question involved that of Anita Nance, who defendant alleged was his common-law wife. She testified to many things that occurred between her and defendant; however, these occurred in the presence of others and were not entitled to protection by the marital privilege. See State v. Newman, 235 Kan. 29, 37, 41-43, 680 P.2d 257 (1984). The challenged testimony concerns the events that occurred the night after the incident when she and defendant were home in bed. She testified that she repeatedly asked defendant what happened and that he finally told her that he had shot Burnett because Burnett "broke and ran." She further testified that, at this time, defendant also told her that Burnett's wife and children were there and that defendant asked one of the children where their mother was.
 
 
 94
 Defense counsel did not object to this testimony at the time it became part of the record. At the hearing on the motion for new trial, trial counsel admitted that he had failed to object and suggested that the court had indicated at a hearing on a motion for mistrial based upon the failure to object that, if an objection had been timely raised, the objection would have been sustained. Defense counsel argued that this alone was grounds for a new trial and perhaps for the appointment of new counsel.
 
 
 95
 In the appellate brief, defendant argues that trial counsel's performance clearly fell below objective standards of reasonableness. Defendant notes that trial counsel had obtained an order prohibiting evidence of private conversations between defendant and his wife and, therefore, was well aware that the wife's testimony might include information about a confession by defendant. Defendant argues that such a statement made in the privacy of their bedroom was inadmissible.
 
 
 96
 The State disagrees. First, the State argues that defendant did not establish that the marital privilege is even relevant here because clear evidence does not exist to establish a marriage between Anita and defendant. At trial, Anita testified that they were married on January 1, 1983, and divorced in the summer of 1987. But she further testified that, in March 1989, they started seeing each other again, got back together, and were living together in Kansas City, Missouri. When she testified, she referred to the defendant as her husband. The State's argument on this issue is weakened by the court's statement at the hearing on the motion for new trial that, for the purposes of this trial, the court considered them married. The district court found they were married, and there is substantial evidence in the record to support that finding.
 
 
 97
 Second, the State argues that defendant's filing of a notice of alibi waived any claim of marital privilege because it would be inconsistent. At the hearing on the motion for new trial, the court believed defendant waived the marital privilege because of an alibi defense. The State admits that it has found no cases holding that one waives a marital privilege for communications that rebut an alibi defense, but argues that an analogy can be drawn with the admissibility of evidence of other crimes to rebut an alibi defense. As support, the State argues that, in State v. Rasler, 216 Kan. 582, 586-87, 533 P.2d 1262 (1975), evidence of a prior conviction was admitted to rebut an alibi defense. This is not quite correct. Rasler, who was charged with aggravated assault and unlawful possession of a firearm, had previously been convicted of unlawfully possessing a firearm. The trial court instructed the jury that it could consider this prior conviction for purposes of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Although defendant objected on grounds of no foundation and no relevancy because the offenses lacked similarity, he did not object to the general form or scope of the instruction. 216 Kan. at 586. The court concluded that defendant's use of alibi as a defense put his identity squarely in issue. Because identity was an integral issue of the case, defendant's arguments of lack of foundation or relevancy failed. 216 Kan. at 587. This court reiterated its disapproval of the giving of a "shotgun" K.S.A. 60-455 instruction but found that the defendant was not prejudiced. 216 Kan. at 587. It should be noted here that, even if defendant's admission to Anita directly rebuts his alibi defense, the testimony was presented in the State's case in chief, not as rebuttal. Further, a defendant is not precluded from raising inconsistent defenses. We find the defendant did not waive the marital privilege because he filed a notice of alibi.
 
 
 98
 Third, the State argues that many jurisdictions have questioned the applicability of a marital communication privilege when the husband and wife are acting together in a criminal activity. Noting an ALR annotation, the State asserts that because the evidence here clearly establishes that Anita and defendant were participating together in the joint criminal activity to rob the Burnetts, their conversation should not be privileged.
 
 
 99
 In Kansas, privileges are set forth in statute. The marital privilege is defined at K.S.A. 60-423, which provides, in relevant part, that an accused "has a privilege to prevent his or her spouse from testifying in such action with respect to any confidential communication had or made between them while they were husband and wife" except for situations which are not relevant to this case. Marital privilege is further defined at K.S.A. 60-428, in relevant part, as follows:
 
 
 100
 "(a) General rule. Subject to K.S.A. 60-437 and except as otherwise provided in subsections (b) and (c) of this section, a spouse who transmitted to the other the information which constitutes the communication, has a privilege during the marital relationship which he or she may claim whether or not a party to the action, to refuse to disclose and to prevent the other from disclosing communications found by the judge to have been had or made in confidence between them while husband and wife. The other spouse or either his or her guardian or conservator may claim the privilege on behalf of the spouse having the privilege.
 
 
 101
 "(b) Exceptions. Neither spouse may claim such privilege ... (4) in a criminal action in which the accused offers evidence of a communication between him or her and his or her spouse, or (5) if the judge finds that sufficient evidence, aside from the communication, has been introduced to warrant a finding that the communication was made, in whole or in part, to enable or aid anyone to commit or to plan to commit a crime or a tort."
 
 
 102
 No evidence in this case indicates the defendant offered evidence of a communication between him and Anita Nance. Furthermore, the evidence did not indicate that the communication that was introduced had anything to do with enabling or aiding anyone to commit or to plan to commit a crime or a tort. At the time the parties had the communication, the offense was over and no action was being taken in furtherance of the robbery or the death of Burnett. Therefore, the communication was subject to the marital privilege in Kansas and is inadmissible.
 
 
 103
 The question, then, becomes whether defense counsel provided ineffective assistance by failing to object to the testimony when it came out in the trial. Although admitting that, possibly, the evidence was inadmissible and trial counsel erred in not objecting to it or requesting that it be struck, the State points out that failure to object could have been a defense tactic to permit another statement by Anita that contradicted prior testimony. Cross-examination of Anita began by pointing out that Anita remained confined in the Atchison County jail under a $10,000 appearance bond since she first gave a statement in July 1989. Apparently, this was not a bond based upon charges pending against her but, instead, was a bond to assure her appearance in court as a witness because she resided outside Kansas. The bond was reduced to $2,000 after she testified at the preliminary hearing, but she did not post bond and was still incarcerated at the time of defendant's trial. Defense counsel further pointed out during cross-examination that at times Anita told officers things that were not true. Furthermore, at the preliminary hearing, Anita testified that she had no later conversations about who had fired the shot. Referring to the preliminary hearing transcript, defense counsel throughout the cross-examination emphasized discrepancies between Anita's trial testimony and her testimony at the preliminary hearing. As an explanation for the change in testimony, Anita asserted that, while sitting in jail for two months since the preliminary hearing, she had a lot of time to think about the events. Her memory, so she claimed, was much clearer at trial than right after the events.
 
 
 104
 Defendant argues that if this error had not occurred, then it is reasonably certain that the results of the trial would have been different because this is the only testimony that directly implicated defendant as the person who shot Burnett. Defendant notes that no aiding and abetting instruction was given, and, therefore, the State's only theory was that defendant shot Burnett. Defendant admits that evidence of other witnesses implicates him with having a gun and pointing it at other members of Burnett's family who were present that night. Furthermore, Anita Nance indicated that defendant threw a gun, possibly a .38, out the car window as they drove away from the Burnett residence. Defendant argues that it is possible that the other individual present that night had a gun and shot Burnett. Thus, only Anita's privileged communication establishes the State's theory that defendant shot Burnett. Without this testimony, such a conclusion, according to the defendant, is based on pure speculation.
 
 
 105
 Defendant argues that he has established ineffective assistance of counsel because defense counsel's performance clearly fell below an objective standard of reasonableness and because it is reasonably certain that the results of the trial would have been different if the evidence had been excluded. Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The standards in Strickland were adopted by the Kansas Supreme Court in Chamberlain v. State, 236 Kan. 650, 694 P.2d 468 (1985), where this court noted that, to show counsel's representation fell below an objective standard of reasonableness, the critical inquiry is whether counsel's assistance was reasonable considering all the circumstances. To be successful, a defendant must overcome a presumption that counsel's assistance is reasonable. 236 Kan. at 654. Furthermore, in determining whether a defendant has established a reasonable probability that the challenged decision would have been different had there been effective assistance, the court must consider the totality of the evidence before the judge or jury. The United States Supreme Court in Strickland recognized that some errors "will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." 466 U.S. at 695-96.
 
 
 106
 Before an appellate court will consider a claim of ineffective assistance of counsel, the trial court must be given the opportunity to assess the performance of counsel. See State v. Van Cleave, 239 Kan. 117, 119, 716 P.2d 580 (1986); Chamberlain, 236 Kan. at 659. As this court stated in Chamberlain: "Much deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened." 236 Kan. at 659-60.
 
 
 107
 Here, in ruling upon the motion for new trial, the district court first concluded that defendant waived the privilege by using an alibi defense. The court further held that if the testimony was erroneously admitted because no objection was made, the error was immaterial and did not result in defendant's conviction by itself because an abundance of other evidence existed to support defendant's conviction. We concur in the latter holding by the district court.
 
 
 108
 In light of the totality of evidence presented to this jury, this error was not the type that would have a pervasive effect upon inferences to be drawn from all the evidence, thus altering the entire evidentiary picture. Granted, in her statement Anita indicates that defendant admitted committing the egregious act of actually pulling the trigger to kill Burnett. However, contrary to the defendant's assertion, the State was not required to prove he did the actual shooting in order to convict him of felony murder. Although this was not an isolated, trivial piece of evidence, because of the totality of the evidence, it does not have a pervasive effect that immediately establishes error justifying reversal of the conviction on the grounds of ineffective assistance of counsel.
 
 
 109
 As noted above, the theory of defendant's cross-examination of Anita was clearly to impeach her credibility as a witness based upon the numerous changes in her testimony since the preliminary hearing. Counsel also emphasized her continuing incarceration and her anger at the defendant and his family. This court is not to judge counsel's performance based upon hindsight. Although trial counsel indicated at the hearing on the motion for new trial that, based upon hindsight, he should have objected to the introduction of the testimony on grounds of marital privilege, this does not establish ineffective assistance of counsel. There is some merit to the State's argument that it was a defense tactic. There is no merit to the defendant's argument that, absent the challenged evidence, the result of the trial would have been different.
 
 
 110
 Defendant has not met the burden of establishing that the errors made by counsel were so egregious that he was not functioning as counsel guaranteed by the Sixth Amendment. Furthermore, defendant has not shown that the deficient performance prejudiced him. There is no showing that the results of the trial are unreliable or that counsel's errors were so serious that they deprived defendant of a fair trial. Thus, defendant has not made the showings necessary to establish that the conviction resulted from a breakdown in the adversarial process, rendering the result unreliable. Strickland v. Washington, 466 U.S. at 687.
 
 
 111
 Finally, defendant argues that the district court erred in failing to grant defendant's motion for new trial because of newly discovered evidence that could be used to further impeach the testimony of Anita Nance. This court discussed the general rules concerning the granting of a motion for new trial when the issue of newly discovered evidence was raised in State v. Ruebke, 240 Kan. 493, 511, 731 P.2d 842, cert. denied 483 U.S. 1024 (1987), as follows:
 
 
 112
 "A new trial may be granted under K.S.A. 60-259 for newly discovered evidence when it appears the rights of a party are substantially affected. The evidence must be of such materiality that it would be likely to produce a different result upon retrial. The credibility of the evidence offered is for the trial court's consideration. State v. Shepherd, 232 Kan. 614, Syl. p 10, 657 P.2d 1112 (1983). In order for evidence to be newly discovered evidence, it must be material to the cause of the movant and contain information which the movant with reasonable diligence could not have discovered and produced at trial. State v. Ferguson, Washington & Tucker, 228 Kan. 522, 530, 618 P.2d 1186 (1980)."
 
 
 113
 The defendant has the burden of proving that newly discovered evidence could not have been produced at trial with the use of reasonable diligence. State v. Bird, 244 Kan. 248, 253, 768 P.2d 284 (1989); State v. Johnson, 240 Kan. 326, 333, 729 P.2d 1169 (1986), cert. denied 481 U.S. 1071 (1987).
 
 
 114
 According to defendant, Anita's testimony was critical and had to be believed by the jury to convict him. Defendant admits that he was able to establish that Anita intensely disliked him, was testifying pursuant to some kind of agreement with the State, and changed her testimony in many details between the time of the preliminary hearing and trial. Defendant argues that additional evidence obtained during her testimony at Gregory Milo's preliminary hearing, which occurred after defendant's trial, would impeach her further. Apparently, at that hearing Anita stated that she was threatened and was forced to go to Atchison to participate in the events. Defendant asserts that this testimony radically contradicted Anita's indication at trial that she voluntarily went to Atchison on the night of the murder because it was her home and she always tried to get home whenever she could, and also that the trip was conducted to obtain drugs. Throughout her testimony at trial, she admitted discussions among her, defendant, and Milo about robbing Burnett but never mentioned coercion or threat. Defendant asserts that, because the State's case depends upon Anita's credibility, this new evidence would severely damage that credibility and produce a different result upon retrial. Therefore, the district court abused its discretion in failing to sustain the motion for new trial.
 
 
 115
 The district court, in overruling defendant's motion for new trial, stated:
 
 
 116
 "As far as Anita Nance's testimony at the Preliminary Hearing of Milo being different than her testimony here at the trial of Mr. Nance, of course, the only thing I can say, generally speaking, is that if you get two different proceedings, it is very hard for any witness to testify exactly the same way.
 
 
 117
 "And I do not think that what you are claiming that she stated about her reason for being up here, whether it is for drugs or because of the fear of her husband, it makes any difference as far as the overall evidence of the trial goes and that it would not change the outcome of the trial in any way, shape, or form as far as that goes.
 
 
 118
 "I do not think it is that relevant, to start with, but even if it was relevant, I think the error is immaterial to the outcome of the trial."
 
 
 119
 At the hearing on the motion for new trial, the State asserted that the testimony from Anita Nance about why she went with defendant and Milo to Atchison was new only because she had never been asked before. When asked, she indicated that hostilities existed between her and her husband, and she felt she was "under a certain amount of threat and duress to comply with her husband's request to participate in this."
 
 
 120
 Defendant has not established that the evidence that Anita Nance accompanied defendant and Gregory Milo to Atchison the night of the robbery and death of Burnett under duress or threat was so material that it is likely it would have produced a different result upon retrial. Although the evidence is material to defendant's case, defendant has not established that it would produce a different result upon retrial. Nor has defendant established that he could not have produced this evidence at trial. Ruebke, 240 Kan. at 511. Defendant has not established that the district court abused its discretion in refusing to grant a new trial based upon newly discovered evidence. We find no abuse of discretion or error by the district court in denying the defendant a new trial.
 
 
 121
 The judgment of the district court is affirmed.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 State v. Nance, Kansas Appellate Case No. 64,668, unpublished opinion entered March 1, 1991. The Kansas Supreme Court also affirmed the trial court's decision to deny petitioner's motion for a new trial
 
 
 [2]
 Nance v. State, Kansas Appellate Case No. 68,098, unpublished opinion entered April 30, 1994
 
 
 [3]
 Petitioner points to Anita's testimony at Milo's preliminary hearing
 
 
 [4]
 The Kansas Supreme Court found no relief was warranted because petitioner did not object to Anita's testimony. Nor did they find petitioner entitled to relief on his related claim of ineffective assistance of counsel, as there was an abundance of evidence in addition to Anita's testimony to support the conviction. State v. Nance, 64,668, slip opinion, p. 10-19